Good morning, Your Honors. Stephen Wicks on behalf of James Denofrio, the appellant in this case. Let me announce the case so that it gets into the record appropriately. Number 18, 1671, Mrs. Denofrio against the Department of Veterans Affairs and Mr. Wicks. Please proceed. Thank you, Your Honor. I apologize for that. If I may, Your Honors, there were three protected disclosures that were litigated in this case, two of which were accepted by the administrative judge. And I want to talk about this for just a moment because the findings on those two issues highlight what we submit as a problem with this case, and that is this. In each instance where the administrative judge accepted the disclosures, and that will be for Dr. Struthers and the polytrauma report, he characterized my client's explanation for why he filed those reports, and we contend he mischaracterized those and essentially labeled him as being dishonest. The law doesn't require proof of motive with respect to the filing of a report. The entry point is that you filed your protective, just made your protective disclosure. And the reason I want to make this point is it was the administrative judge who asked my client with respect to the Struthers report why he didn't talk to him first, as if there would be some obligation to do that, and there isn't. My client's response was that I did talk to him. They were friends. He started crying. He admitted that he had a problem, but then he ended the conversation. The administrative judge took that testimony and essentially said, well, this tells me that you viewed him as being formal and strict and cut off the discussion. Let's take this piece by piece. With respect to Struthers, was there any retaliation for Struthers? Yes, Your Honor, there was. I mean, the retaliation all the way, both before the polytrauma, after Struthers, and then after polytrauma, and after audiology. So it's hard to piece out which retaliation was specifically attended to, which disclosure, but I can say that the AIB, for example, the administrative board that was instigated, which we contend was retaliatory. Specifically, if you look at the two complaints that were made to start that from Ms. Homan and Ms. Krause, they very, very, very specifically attacked my client for his report of Dr. Struthers, and so that, we don't believe that Mr. D'Onofrio should be permitted to have whistleblower protection for the Struthers report because of his character. They labeled him as a That's the trigger to the retaliatory action, Your Honor. Which was? Which was the AIB. The administrative investigative board is essentially the equivalent to a grand jury in a criminal proceeding, and the, of course, the administrative judge said, well, there's no retaliation there because there's no threat of, there are no Just like a criminal charge, the institution of an investigative board, which had a, you know, multiple pages of accusations, it has an inherent risk and threat of discipline. But there was no discipline, is that right? There was no discipline, we agree. And, but at the end, Your Honor, the, my client received a letter that said, no action, we find that you are guilty of these charges, but no action will be taken. And so the, the point of that is that for the 10 months that that AIB was in place, there was a, we submit an inherent threat of discipline. And when you look at the cases, we've, I've supplied the court with the, the, the threat cases. Now, they didn't arise under investigations, but the Mistrula case, for example, discusses both explicit and implied threats. And the, the Mistrula case in particular, if you look at the Spears case that's cited in there, the the board approved an implied threat and said, if, if, for example, if you threaten someone with discipline because you accuse them of doing something wrong and there's no evidence that they, that they did this, that's, that's a prohibited action. And so what remedy are you seeking? Well, in terms of remedies, Your Honor, I mean, I will go on to some other very specific retaliation we, we contend occurred with respect to positions that were denied. But let me finish. But the board is less qualified than other applicants, right? That is correct. In which he wouldn't have gotten a job anyway. That was the finding in both of those positions. If I, if I may, just one more point before I hit that, Your Honor. In, in terms of the, this whole issue of, well, there was no threat. And remember that under, under the Savage case, the board has defined a, a prohibited action as one that has an impact, a significant impact on working conditions that may result in a chilling effect upon whistleblowers. So if you look in this case at the number of investigations, both against my client and against the witnesses in their MSPB cases, that we contend that these investigations are essentially being weaponized to shut people down, to intimidate them from filing, you know, on to, on to your point, Your Honor. If you look at the two positions in particular that were denied, one is the privacy officer position. The administrative judge concluded that there was clear convincing evidence they would have hired the other applicant anyway. And however, the, the evidence indicated, and, and Mr. Mills, the selecting authority, admitted that my client had the highest score and generally the highest scoring person gets the job. And the administrative judge minimized the, Mr. Mills' incentive to retaliate against my client. So you really didn't have much of an incentive. However, Mr. Mills was the appointing authority for Dr. Struthers. And my client's report called into question Mr. Mills' judgment from a management perspective for allowing Dr. Struthers to continue to act as a physician. In, in addition to that, Mr. Mills, you know, in sort of a classic, I'll, I'll make any decision I want to make, didn't ask any questions during the interview, didn't maintain any job, he talked about sports, and the interview was over. So that is a, that is a scenario that warrants caution in terms of accepting the explanation where there's absolutely no way to make a determination, because there was no record, of what went into the decision-making process. The other point I want to make on this decision, Your Honor, is that there was a pattern that was not examined by the administrative judge under Whitmore. And that is that we had three management people, after my client became a whistleblower, make comments that were very, very similar. And that is Mr. Mills, in this case, saying, go to the, authority, appointing authority in the second position, the contractor's office position, told her secretary, when the resumes were being handed out, that it won't be Jay. And Dr. Struthers gave my client and Mr. Skirata, the co-whistleblower, a recruiter list, a VA recruiter list, and said, you know, look for employment elsewhere. Now, that's a pattern that we submit. It has to be looked at in total. It can't be disaggregated, because it, you know, Whitmore dictates you have to look at the, at the evidence in its totality, not piece by piece. And, you know, I admit. Didn't she look at his resume before she was handing them out, and saw that his score was considered to be lower? No, Your Honor. That, the, the, the scoring would have occurred after the resume was handed out. The what? The scoring would have occurred after the resume was handled out. The testimony was, this was before the panel was established. And, and, Your Honor, so I may, Dr. Kurian, also, by the point that, that, that process was starting to unfold, had already outed my client as a whistleblower directly to Dr. Struthers on July 25, and the, the interview wasn't until August. And, and we, I submit to this court that one of the issues that has to be examined, whether as a prohibited action or as a hostile work environment issue, whether it's separate or not, is where the, where the management outs the whistleblower. In this case, directly to the subject of, of the whistleblowing, Dr. Struthers. That, that's an event that is extremely telling in terms of the motive and, and the conduct of that official afterwards. So, you know, Dr. Kurian told her, her, Ms. Gerringer, who's another witness in the case, she came into the office when Mr. D'Onofrio was there, after he had blown the whistle, saying, don't talk to him anymore. She was very angry and gesticulating with her hands in a chopping motion. So that occurred even just before we knew officially that she knew about his whistleblowing on July 26, and before the selection process in, in August. So we submit that, that that change, where she's a selecting official, makes it virtually impossible to get past clear and convincing evidence. And, and the other thing I want to point out is on the, the Struthers recruiter list to Mr. D'Onofrio and Mr. Scarrotta, the administrative judge said, well, you know, we dispute what Mr. D'Onofrio said because he, that, that list wasn't there. The list was given to him in April of 2013. And he cited the record from an EEO investigation. Well, I've cited the actual testimony to that, and the testimony in the record was that Struthers later gave him the list of employees, not on April 13, not on April of 2013, as the administrative judge concluded. So nowhere in the case does the administrative judge try to look at the larger picture. And, and the part that I submit is even more critical in terms of larger picture is, we have an employee who had year after year after year after year of outstanding evaluations, leadership positions within the facility. He and his whistle, he and his co-whistleblower make this report on Dr. Struthers, who was a friend, beloved in the facility. And after that, these investigations start, not only against them, but against the witnesses in the case. And Ms. Appleby, Mr. Dabrowski, other employees, privacy investigations at large against all of their department. And nowhere in this case is that issue analyzed by the administrative judge. Where does that get us? The AHA found that there were two instances of a prima facie case of reprisal, but no retaliation. So where does that leave us? Well, Your Honor, it leaves you, from our perspective, in analyzing the question of whether investigations can be made into weapons and used to intimidate employees who are whistleblowers. I mean, if savage means anything, savage and roach mean anything, they say that a change in working conditions that results in a chilling effect on the person's inclination to make reports is a prohibited personnel practice. And that's the issue before this Court. We submit to the Court that the only answer has to be yes, that you can't just initiate investigation after investigation, run them out to the end of the, like walking the plank, hold them there for nine or ten months as they did with the AIB, and then say, okay, we're not going to do anything. Somehow that has to stop. That is as antithetical to the intent of the- What has to stop? The ability of the agency to use investigations to silence employees. But you can't issue an edict that there'll be no investigations of issues that arise. I agree, but you can issue an opinion that says, if we find that you've done that with an improper motive, that is, with a retaliatory intent, then you're going to be held responsible. That's the only way that this can work, in our opinion, that we submit to you. There has to be a decision that says, you can investigate until the cows come home, but you better be doing it for a legitimate purpose. Because the consequence, if it's not legitimate, is you're going to shut down whistleblowers. You're basically going to say to them, the agency's free to drag you over the coals every day of the week, as much as they want, with that impact. Let's hear from the government. Thank you. Ms. Cole. Thank you. May it please the court. This court should affirm the decision of the Barron Systems Protection Board denying Mr. D'Onofrio's individual right of action appeal. The administrative judge did not abuse his discretion by excluding evidence regarding VA investigations of Mr. D'Onofrio, because investigations that do not cause a significant change in duties, responsibilities, or working conditions are not prohibited personnel practices under 5 U.S.C. 2302. Mr. D'Onofrio did not argue below, nor does he argue here, that the investigations caused a significant change in his working duties, responsibilities, or work conditions. Instead, he merely argues that the board has previously considered evidence of investigations, but as board case law makes clear, including the decision that opposing counsel cites, the board will only consider evidence of investigations when they could have been a pretext for later retaliatory action. Here, the investigations cannot possibly have been a pretext, because they occurred after almost all of the alleged retaliatory conduct at issue in this case. The only alleged actions that occurred after were Mr. D'Onofrio's claim that Gina Homan, his temporary supervisor, denied his overtime and changed his duties. But Ms. Homan played no role whatsoever in the investigations that preceded this. In November of 2014, numerous employees reported that Mr. D'Onofrio behaved inappropriately during a meeting. Ms. Homan was not in that meeting, nor did she play any role in the subsequent investigation. In June of 2015, Daniel Shea, a coworker of Mr. D'Onofrio's, complained to the privacy office because he believes that Mr. D'Onofrio may have inappropriately been accessing his medical records. And so the privacy office investigated that, but again, that was Daniel Shea, not Ms. Homan, that made that complaint, and it was the privacy office that investigated it. Ms. Homan played no role whatsoever. And so here, the administrative judge did not abuse his discretion by excluding evidence of these investigations because the investigations cannot possibly have been a pretext for the alleged retaliatory action. Now, if the court doesn't have any questions, I respectfully request that the court affirm the decision of the marriage. Any questions? Okay. Thank you, Ms. Cole. Okay, Mr. Wicks, you have two minutes for rebuttal. Your Honor, just on the point of the disconnect between Ms. Homan, for example, and Ms. Blocher on the privacy investigations, Ms. Blocher was the third person who filed a complaint in the AIB, and Ms. Blocher, in her complaint to the AIB and in her testimony that we've cited, expressed great sympathy for Dr. Struthers with respect to what was, quote, that was the third complaint that was filed, or the third protected disclosure that was filed by my client. That was in June of 2015. And after June of 2015, Mr. Shea, well, both in June and in July, initiated investigations, one against my client and one against Mr. Dombrowski. So I submit that the clean hands argument doesn't actually apply to those two people with respect to these investigations. But even on that position, there is no remedy. I'm sorry? Where there was no adverse action taken. Well, there is a remedy in the sense that, number one, there would be potentially a compensatory damage remedy under the act, which is now recognized, Your Honor. And secondly, for example, the AIB, where my client was labeled as having a cognitive disorder, was put into the record. It was put into, it was claimed to be present tense by Mr. Mills, and then it was put into the AIB. And then that word spread through the facility. So that would be part of a compensatory damage claim. In addition, Your Honor, we contend that at some point we should be able to bring a stop to the investigations. Okay. Anything else? Thank you, Your Honor. Thank you both. The case is taken under submission.